IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re AZURIX CORP.<br>SECURITIES LITIGATION, | §<br>§ | |
| IRVING ROSENZWEIG, et al., | §<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. H-00-3493<br>(CONSOLIDATED) |
| AZURIX CORPORATION, et al., | §<br>§ | |
| Defendants. | § | |

United States Courts
Southern District of Texas
ENTERED

**MAR 2 1 2002**

Michael N. Milby, Clerk of Court

## MEMORANDUM AND ORDER

Plaintiffs, Irving Rosenzweig, Miller/Howard Investments, Inc., Masoud Faisal M. Al Fuhaid, Walter Wooten, Malcolm Rosenfeld, Ruthy Parnes, Bruce Kalish, and Todd Williams, bring this consolidated class action on behalf of themselves and all others similarly situated who purchased the common stock of Azurix Corporation from June 9, 1999, through August 8, 2000 (the "Class Period"). Plaintiffs have sued defendants, Azurix Corporation ("Azurix"), Enron Corporation ("Enron"), and six of Azurix's and Enron's present and former officers and directors, Kenneth Lay, Jeffrey Skilling, Rodney Gray, Joseph Sutton, Rodney Faldyn, and Rebecca Mark, for violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(2), and 77o; §§ 10(b) and 20(a) of the Securities and Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and

Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17

C.F.R. § 240.10b-5.    Plaintiffs seek certification as a class

action pursuant to Fed. R. Civ. P. 23, compensatory and rescissory

damages, costs, and expenses, including counsel and expert fees.

Pending before the court are Enron Corp. and Atlantic Water Trust's

Motion to Dismiss[1] (Docket Entry No. 29) and the Joint Motion of

Azurix Defendants to Dismiss Complaint for Failure to State a Claim

(Docket Entry No. 30).    For the reasons set forth below,

defendants' motions will be granted.

## I.  **Factual Background**

Azurix is a global water company engaged in the business of

acquiring, owning, operating, and managing water and wastewater

assets, providing water- and wastewater-related services, and

developing and managing water resources.    Azurix was formed on

January 29, 1998, by Enron.    In October of 1998 Enron purchased

Wessex Water LLC ("Wessex"), a water and wastewater company based

in the United Kingdom, and merged Wessex into Azurix.    Later that

year Enron contributed its 100% ownership in Azurix to Atlantic

Water Trust ("Atlantic"), in exchange for a 50% stake in Atlantic.

Subsequently and throughout the Class Period, Enron controlled

---

[1]Pursuant to the agreed motion of the parties, Atlantic Water
Trust was dismissed from this action without prejudice on
January 24, 2002.  (Docket Entry No. 51)

33.5% of Azurix common stock.  On June 9, 1999, Azurix filed a registration statement with the SEC, and went public through an initial public offering ("IPO") on the same date.  Pursuant to the registration statement and prospectus, Azurix offered 36,600,000 shares to the public at the price of $20.50 per share.

During the Class Period a majority of Azurix's officers and directors were also present or former officers or directors of Enron.  Rebecca Mark was Azurix's Chief Executive Officer ("CEO") and chairman of Azurix's board of directors; Mark was also a director and vice chairman of Enron.  Rodney Faldyn was a managing director and Chief Accounting Officer of Azurix.  Joseph Sutton served as a director of Azurix and a vice chairman of Enron. Rodney Gray was Chief Financial Officer and a vice chairman of Azurix.  Prior to and throughout the Class Period Mark, Faldyn, Sutton, and Gray also served in various official and directorial capacities with numerous Enron subsidiary companies.  Jeffrey Skilling and Kenneth Lay were also directors of Azurix throughout the Class Period.  Skilling also served as President and Chief Operating Officer ("COO") of Enron, and Chairman and CEO of Enron North America Corporation; and Lay served at various times as Chairman of the Board, CEO, President, and COO of Enron.[2]

---

[2]Unless otherwise noted, Lay, Skilling, Gray, Sutton, Faldyn, and Mark, will be referred to in this Memorandum and Order as the "individual defendants."

## II.  **Plaintiffs' Allegations**

Plaintiffs allege that during the Class Period defendants knowingly disseminated to the investing public, in public securities filings and press releases, materially false and misleading information concerning Azurix's privatization strategy, acquisitions, financial condition, and future business prospects. Plaintiffs allege that defendants' false and misleading statements, failure to disclose material adverse information, and failure to correct the false and misleadingly positive nature of prior statements had the aggregate effect of artificially inflating the market prices of Azurix common stock from June 9, 1999, the date of Azurix's initial public offering, through August 8, 2000.

## A.    **Representations Alleged to be False or Misleading**

### 1.  The Registration Statement and Prospectus

Plaintiffs allege that the registration statement and prospectus (collectively, "the prospectus") that Azurix filed with the SEC pursuant to its IPO on June 9, 1999, and June 11, 1999, respectively, were materially false and misleading for a number of reasons.[3]  First, plaintiffs allege that defendants "touted" in these documents Azurix's ability to take advantage of the growing trend of privatization and outsourcing of government-owned water

---

[3]The June 9, 1999, registration statement was signed by Mark, Gray, Sutton, Skilling, and Lay (¶¶ 20-21, 23-25).

and wastewater assets and services (¶ 2).[4]  Azurix advertised its "experienced management and business development teams," its "operating experience and technical expertise," its "regulatory and government affairs expertise," and its "financing expertise" as strengths that would enable Azurix to become a successful competitor in the water business.

Plaintiffs allege that the prospectus was also false and misleading because it "touted" Azurix's ability to become a "successful player" in the global water and wastewater industry (¶ 53).  Plaintiffs allege that these statements were false and/or misleading because Azurix could not compete with its primary competitors due to its high leverage, capital constraints, and insufficient liquidity (¶ 77).

Plaintiffs further allege that the prospectus was false and/or misleading because Azurix identified numerous large public privatization projects in Europe, North America, Latin America, the Caribbean, the Middle East, Africa, and Asia that it "targeted." Plaintiffs allege that defendants specifically emphasized certain global privatization development opportunities that Azurix intended to pursue "vigorously" as part of its "business plan," including interests in long-term water concessions in Argentina and Mexico (¶ 55).

---

[4]Paragraph references in parentheses are to the numbered paragraphs of plaintiffs' Consolidated and Amended Class Action Complaint, Docket Entry No. 26.

Plaintiffs allege that Azurix "repeatedly vaunted" its successful bid for an interest in a long-term water and wastewater concession in Buenos Aires, Argentina (the "Buenos Aires concession") (¶ 3).[5]  The registration statement and prospectus stated that Azurix would assume operations of the Buenos Aires concession on June 18, 1999, and that Azurix estimated spending approximately $1 billion over 30 years on capital improvements pursuant to the concession agreement, with $405 million expended within the first five years of the agreement.  Plaintiffs allege that the prospectus also stated that financing for these improvements "would come from operating cash flows and long-term debt and equity at the concession level" (¶ 59).  Plaintiffs claim that these statements were materially false and misleading because required capital expenditures were actually far greater than what defendants represented (¶ 60).  Plaintiffs also allege that Azurix financed these capital improvements, as well as its own long-term debt, with massive short-term debt instead of through "operating cash flows and long-term debt and equity."

The registration statement and prospectus also stated that Azurix would evaluate each project to assess its value by

---

[5]On May 14, 1999, Azurix submitted a bid for a concession for the water and wastewater systems operated by the Administracion General de Obras Sanitarias Buenos Aires in two of the three regions of Buenos Aires, Argentina (¶ 49).  On May 18, 1999, Azurix announced in a press release that it had been awarded this Buenos Aires concession (¶ 50).

conducting a due diligence review, identifying and quantifying the specific risks of each transaction.  Plaintiffs allege that the prospectus thus misled the investing public into concluding that defendants had performed due diligence for its projects before bidding on them (¶ 56).

Plaintiffs allege that these statements regarding due diligence were specifically false and misleading with respect to the Buenos Aires project.  Plaintiffs claim that these statements were misleading because the due diligence conducted by defendants failed to include any review before the project was assumed of the completeness, accuracy, or validity of accounts receivable and other assets of the concession (¶ 72).  Plaintiffs claim that information disclosed after the IPO indicated that the Buenos Aires concession had faced "numerous problems" from the very beginning due to incomplete customer accounts, difficulties in accounts receivable collection, failure of the Argentinian government to transfer assets, water quality issues, and disputes over tariffs. Plaintiffs allege that these facts materially impaired the financial condition of the company.

Plaintiffs also allege that defendants failed to disclose in the prospectus the extent of the water quality remediation costs that would be involved under the Buenos Aires concession. Plaintiffs claim that the concession agreement required Azurix to perform clean-up water quality services that expended "significant

capital" beyond Azurix's wherewithal.  Plaintiffs allege that these water remediation costs "skyrocketed" during the Class Period and caused a material adverse impact on the financial condition of the company (¶ 5).

### 2. Other Alleged False and Misleading Representations Made During the Class Period Following the IPO

Plaintiffs allege that defendants reported to analysts "at the time of the IPO" that Azurix's earnings would approximate $500 million for the year 2000 and $800 million for the year 2001 (¶ 79).  Plaintiffs allege that defendants lacked any basis to make these earnings estimates because at that time Azurix was already suffering from a heavy debt burden, lack of liquidity, and lack of access to the equity capital market.

On July 6, 1999, the financial services firm of PaineWebber, Inc. ("PaineWebber") rated Azurix a "buy," set a twelve-month target price of $32 per share, and stated that "[m]anagement has identified approximately $16 billion in potential privatization projects that are likely to come into fruition over the next 18 to 24 months" (¶ 78).

On August 5, 1999, Azurix announced in a press release its results of operations for the quarter ending June 30, 1999 (¶ 80). In this press release Mark stated:

> The second quarter was a period of significant accomplishment for Azurix . . . .  We won a large concession in the Province of Buenos Aires, establishing the company as a major participant in the Argentine water

market. . . .   We also completed our very successful
initial public offering during this quarter.   This
offering provides Azurix with access to additional
financial resources to fund the many growth opportunities
that will distinguish the company as a leading player in
the global water industry.

Plaintiffs allege that this press release was materially false and

misleading because defendants knew, or recklessly disregarded at

the time, that Azurix could not function as a "leading player in

the global water industry" because of its high cost of capital,

highly leveraged balance sheet, capital infusion constraints, and

insufficient liquidity.  Plaintiffs also allege that the IPO failed

to provide Azurix with sufficient resources to take advantage of

"growth opportunities," and that defendants failed to disclose the

problems already associated with the Buenos Aires concession.

On August 6, 1999, PaineWebber issued a report reiterating its

"buy" rating for Azurix.   This second PaineWebber report also

stated that Azurix's "acquisition strategy remains robust," and

that the Buenos Aires concession established the company as "a

major participant in the Argentine water market."   The report also

opined that the concession "should begin contributing to operating

results in the third quarter" (¶ 82).

On August 16, 1999, Azurix filed with the SEC a Form 10-Q, the

company's interim report signed by Faldyn for the quarter ending

June 30, 1999 (¶ 83).  Because the interim report repeated many of

the statements contained in the August 5, 1999, press release,

plaintiffs allege that it was false and misleading.

On October 15, 1999, PaineWebber published a third report maintaining its "buy rating" for Azurix. The report stated that "[m]anagement has recently emphasized that the Company's pipeline of attractive privately and publicly announced transactions remains very full and that investors should anticipate several more announcements in the next few months" (¶ 87).

On October 20, 1999, the price of Azurix stock fell from $13.75 to $12.00 per share. That same day, the <u>Dow Jones News Service</u> ran a story in which Azurix purportedly stated that there was no corporate news to account for the 7.7% dip in shares. The news story also reported that Azurix spokesperson Carol Hensley had commented that "[o]ur fundamentals are strong" (¶ 88). Plaintiffs allege that these statements were materially false and misleading because they were made just two weeks before Azurix announced that its earnings would fall short of Wall Street estimates. Plaintiffs also allege that defendants knew at the time of the press release that the Buenos Aires concession was plagued with multiple problems, and that numerous privatization projects had been canceled or postponed in the second half of 1999.

On November 4, 1999, after the close of trading, Azurix announced in a press release that it would miss fourth-quarter analysts' earnings expectations (¶ 89). In the press release, Mark stated:

> The pipeline of private transactions and announced public tenders that we are pursuing remains very strong, even

though the timing of certain transactions is unpredictable . . . . We will focus more on privately negotiated opportunities and less on the large public privatizations, which we will only consider if our investment can return significant value to our shareholders. With the uncertain timing of public bids, we are ensuring that our operating and general and administrative expenses are in line with our current investments.

Following this news the price of Azurix stock fell from $12.8125 per share to $7.775 per share. Plaintiffs allege that the statements in the November 4, 1999, press release were false and misleading because several major privatization projects had already been canceled or postponed, and the timing of public bids was not "unpredictable." Plaintiffs also allege that defendants failed to disclose that the shift in Azurix's business strategy, from an emphasis on "large public privatizations" to a focus on "privately negotiated opportunities," was in fact a reaction to the cancellation and postponement of major privatization contracts in the second half of 1999 (¶¶ 6, 92).

On November 15, 1999, Azurix filed with the SEC on Form 10-Q its interim report signed by Faldyn for the quarter ending September 30, 1999 (¶ 93). The report estimated a non-recurring pretax charge for the fourth quarter of 1999 involving the reduction of corporate personnel, leased office space, and other restructuring charges totaling approximately $30 to $35 million. Plaintiffs allege that defendants knowingly failed to disclose "the then-existing conditions necessitating the estimated fourth-quarter

pretax charge" (¶ 94).  Plaintiffs also allege that this Form 10-Q

contained many of the same statements that were put forward in the

November 4, 1999, press release.

On February 7, 2000, Azurix announced the results of its

operations for the fourth quarter of 1999 in a press release

(¶ 101).  In this press release Mark stated:

> In the past year we have assembled the core assets and
> capabilities for strong growth in our key markets. . . .
> We have successfully expanded our operations through the
> ownership of assets and through the services we offer as
> a total solutions provider to our municipal and
> industrial customers. . . . Our Madera Ranch Water Bank
> project in California is an example of an innovative
> resources project which has considerable potential both
> for the community and for the company.

Plaintiffs allege that these statements were knowingly false and

misleading because Azurix had been grappling continually with acute

problems that adversely affected its revenue generation from the

Buenos Aires concession.  Plaintiffs also allege that the statement

that Azurix had "assembled the core assets and capabilities for

strong growth" was materially false and misleading given the

numerous cancellations and postponements of major privatization

projects.  Plaintiffs allege that Mark knew, or recklessly disre-

garded, that generating revenue from municipal and industrial

customers was "challenging and problematic" due to the cost of

replacing or refurbishing many old or antiquated municipal water

systems (¶ 104).  Plaintiffs also allege that Mark's statements

about the Madera Ranch Water Bank project ("Madera project") were

materially false and misleading because Mark knew, or recklessly disregarded, that the project was contingent upon government permits, construction expenditures, and local property owner concerns, all of which rendered the project "inherently uncertain" (¶ 103).

On March 30, 2000, Azurix filed its annual report with the SEC on Form 10-K for the year ending December 31, 1999 (¶ 106). This document was signed by Mark, Sutton, Skilling, and Lay. In the Form 10-K Azurix stated that its required capital expenditures for the year 2000 were expected to total $300 million. While discussing the causes of a $32.4 million fourth-quarter restructuring charge, Azurix revealed the allegedly "new and previously undisclosed fact" that during the second half of 1999, a number of large privatization projects had been canceled or postponed. The Form 10-K also disclosed that the Buenos Aires concession had been suffering various problems, including incomplete customer accounts and other billing difficulties, and disclosed the "uncertain nature" of the Madera project. Plaintiffs allege that defendants still failed to disclose, however, additional problems with the Buenos Aires concession involving poor water quality and tariff disputes (¶¶ 8, 111). Plaintiffs also allege that the Form 10-K contained many of the same false and/or misleading statements that were published in the February 7, 2000, press release (¶ 106).

On May 8, 2000, Azurix reported in a press release its results of operations for the quarter ending March 31, 2000 (¶ 116). Azurix announced a 29% decline in first-quarter 2000 earnings, but Mark stated that "Azurix continues to make steady progress toward the company's objectives to maximize the returns on our existing businesses." Plaintiffs allege that this statement was materially false and misleading because Mark knew or recklessly disregarded the fact that Azurix's earnings would be negatively impacted by water quality problems in Bahia Blanca, Argentina, that began in April of 2000.[6] Plaintiffs also allege that this statement was false and/or misleading in light of the recent disclosure of the $32.4 million restructuring charge (which was almost three times Azurix's net income for the quarter) in the March 30, 2000, Form 10-K (¶¶ 7, 9).

On May 15, 2000, Azurix filed with the SEC on Form 10-Q its interim report for the quarter ending March 31, 2000 (¶ 118). Plaintiffs allege that the Form 10-Q was false and misleading because it repeated many of the statements contained in the May 8, 2000, press release.

On August 8, 2000, the final day of the Class Period, Azurix announced in a press release its financial results for the second

---

[6]Plaintiffs allege that in April of 2000 Argentinian authorities tested the water in Bahia Blanca, discovered algae, and determined that the water was not drinkable. The authorities demanded that Azurix clean the water (¶ 117).

quarter of 2000 (¶ 122).  Azurix reported a charge of $5.4 million

caused by problems and expenses involving the poor water quality in

Bahia Blanca.   Azurix also announced that earnings per diluted

share had fallen from 19 cents for the second quarter of 1999 to 5

cents for the second quarter of 2000, and that net income had

fallen from $11.4 million in the first quarter of 2000 to $6.2

million for the second quarter of 2000.  Defendants further stated

that slow growth in Argentina would cause Azurix to lower its

earnings forecast for the year 2000 from the prior target of $310-

340 million to $270-290 million.  However, Mark also stated in the

press release:

> Our management team is working hard on the challenges
> that we face in Argentina and to maximize the returns on
> our existing businesses . . . .  We are pleased with
> Wessex Water's performance and the growth in our North
> American service businesses.   Azurix North America
> reported strong double-digit revenue growth during the
> quarter and announced wins in municipalities in
> New Jersey and Louisiana.  The acquisition of Baker
> Hughes Industrial Services gives us an unmatched
> industrial services platform and expertise in the North
> American market, and we are negotiating contracts with
> key large industrial customers for long-term outsourcing
> of their water and wastewater treatment facilities.

Plaintiffs claim that Azurix attributed its decline in diluted

earnings per share and net income to rate cuts, acquisition costs,

tax differences, and an increase in outstanding shares, when in

fact the decline was brought about because Azurix's privatization

strategy "never got off the ground," Azurix's attempt to shift

business strategies failed, and the Buenos Aires concession

consistently produced poor operating results (¶ 125).  Following
the August 8, 2000, announcement, Azurix's share price fell $1-5/64
to $7-1/4 on extremely heavy volume (¶ 10), marking a decline from
an offering price of $19 per share and from a Class Period high of
$23.875 per share.

**B.   Plaintiffs' Discovery of the False and Misleading Nature of
       Defendants' Representations**

On May 1, 2000, <u>Business Week</u> reported that "[s]ome analysts
now say that the [Azurix public] offering was rushed. . . .  Soon
after the IPO, many of Azurix's most promising prospects fizzled"
(¶ 115).  The article also observed that the Buenos Aires
concession "has significantly underperformed expectations" (¶ 110).

Plaintiffs allege that a number of Azurix officers and
directors abruptly resigned from the company under "suspicious"
circumstances.   On November 16, 1999, Azurix announced the
resignation of Gray (¶ 95).  Faldyn resigned on March 31, 2000
(¶ 113), and Christopher Warden, head of Azurix's Internet
ventures, resigned on April 10, 2000 (¶ 114).  On August 25, 2000,
Azurix announced the resignation of its chairperson and CEO,
Rebecca Mark (¶ 11, 127).  Mark also resigned from the board of
directors of Enron.  Following Mark's resignation Azurix's share
price dipped $9/16 per share, closing at $5 per share.  As of
October 26, 2000, Azurix stock was trading at around $3.50 per
share.

On December 16, 2000, Enron agreed to buy back Azurix's publicly-traded shares for approximately $325 million, taking Azurix private at $8.375 per share.  An article published in the Houston Chronicle on the day of the takeover announcement stated that "Azurix has been struggling almost since its inception.  Its business plan was to acquire and operate or manage public water and wastewater facilities that are being privatized worldwide.  But the company was never able to compete effectively in bidding for water systems against . . . huge multinational rivals . . ." (¶ 12).  On January 22, 2001, Azurix announced that it would write off $470 million as an "asset impairment charge" related to its investment in the Buenos Aires concession.  This amount constituted $30 million more than Azurix's initial investment in the concession (¶ 13).

## C.    Alleged Involvement of the Individual Defendants

Plaintiffs allege that each of the individual defendants, through their official positions with Azurix and Enron, knew or had access to material adverse, non-public information about Azurix's business strategies, finances, and present and future business prospects, none of which was disclosed (¶¶ 20-25).  Plaintiffs also allege that each defendant participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about Azurix.

Plaintiffs allege that the individual defendants, as officers and directors, and Enron, as a controlling stockholder of Azurix,

were "controlling persons" of Azurix within the meaning of § 15 of the Securities Act and § 20 of the Exchange Act (¶ 29).  Plaintiffs also allege that by reason of their positions as officers, directors, or controlling stockholders of Azurix, these defendants had the power and authority to cause Azurix to engage in the wrongful conduct alleged in their complaint.  Plaintiffs further allege that because the individual defendants attended board of directors and management meetings, these defendants were responsible for the truthfulness and accuracy of Azurix's public reports and releases (¶ 30).

## D.    Statutory Claims Asserted Against Each Defendant

Plaintiffs allege that all the defendants are guilty of violations of § 12(a)(2) of the Securities Act.  Plaintiffs allege that Azurix and the individual defendants are also guilty of violations of § 11 of the Securities Act and § 10(b) and Rule 10b-5 of the Exchange Act.   Under these Exchange Act provisions, plaintiffs allege that these particular defendants (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts that would make the statements not misleading; and/or (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the plaintiffs in connection with their purchases of Azurix common stock during the Class Period.

Plaintiffs also sue Enron and the individual defendants for violations of § 15 of the Securities Act and § 20(a) of the

Exchange Act as "controlling persons" under the Acts, who had power and authority to cause Azurix to engage in the wrongful conduct complained of.

**E.   Summary Chart of Plaintiffs' Allegations**

Plaintiffs' complaint excerpts, in somewhat disorganized fashion, favorable statements from sixteen different sources that plaintiffs allege were false and/or misleading when made. Plaintiffs have not alleged that all of these statements had a positive impact on the market price of Azurix stock. Nevertheless, these statements fall into four general categories: (1) statements about Azurix's privatization and other business strategies; (2) statements about Azurix's acquisitions, including statements involving the Buenos Aires concession and associated due diligence conducted; (3) statements about Azurix's financial condition, including potential earnings; and (4) statements about Azurix's future business prospects. The following chart lists in chronological order each source alleged by plaintiffs to contain false and/or misleading statements, identifies the numbered paragraph of plaintiffs' complaint in which the allegations are made, identifies by "X" which of the four categories of allegedly false and/or misleading statements are contained in each source, and states the effect, if any, the statements allegedly had on Azurix's share price.

| Documents | ¶ | Privatization/ Strategy | Acquisitions | Financial Condition | Future Prospects | Share Price |
|---|---|---|---|---|---|---|
| June 9, 1999 Registration Statement | 2, 53 | X | X | | X | |
| June 11, 1999 Prospectus | 2, 54 | X | X | | X | PaineWebber Buy Rating (¶ 78) |
| Statement to Analysts "at IPO" | 79 | | | | X | |
| July 6, 1999 PaineWebber ("PW") Report | 78 | X | | | X | |
| August 5, 1999 Press Release | 80 | | X | | X | PaineWebber reiterates buy rating (¶ 82) |
| August 6, 1999 PW Report | 82 | | X | | X | |
| August 16, 1999 SEC Form 10-Q | 83 | | X | | X | |
| October 15, 1999 PW Report | 87 | X | X | | | |
| October 20, 1999 Dow Jones News Story | 88 | | | X | | Decrease: from $13.75 to $12.00 per share |
| November 4, 1999 Press Release | 6, 89 | X | | | | Decrease: from $12.8125 to $7.775 |
| November 15, 1999 Form 10-Q | 65, 93 | X | | | | |
| February 7, 2000 Press Release | 101 | X | X | | | Unspecified Decrease |
| March 30, 2000 Form 10-K | 7, 106 | X | X | X | | |
| May 8, 2000 Press Release | 9, 116 | X | | | X | |
| May 15, 2000 SEC Form 10-Q | 75, 118 | X | | | X | |
| August 8, 2000 Press Release | 10, 122 | X | X | X | | 12% Decrease to $7¼ |

III.  **Legal Standards**

A.  **Motion to Dismiss**

Motions to dismiss urged pursuant to Fed. R. Civ. P. 12(b)(6) should not be granted unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. Conley v. Gibson, 78 S. Ct. 99, 101-02 (1957). See also Rolf v. City of San Antonio, 77 F.3d 823, 827 (5th Cir. 1996). When ruling on a motion to dismiss, the court accepts the factual allegations of the complaint as true. Norman v. Apache, Corp., 19 F.3d 1017, 1021 (5th Cir. 1994), citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520 (5th Cir. 1993). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss," however. Jefferson v. Lead Indus. Ass'n, Inc., 106 F.3d 1245, 1250 (5th Cir. 1997). "Dismissal can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged in support of a cognizable legal theory." Corporate Health Ins. v. Texas Dept. of Ins., 12 F.Supp.2d 597, 603-64 (S.D. Tex. 1998).

Although courts must normally limit their inquiry to facts alleged in the complaint, to the documents either attached to or incorporated into the complaint, and to matters about which they may take judicial notice, when deciding a motion to dismiss securities fraud claims courts may also consider "the contents of

relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." <u>Lovelace v. Software Spectrum, Inc.</u>, 78 F.3d 1015, 1017-18 (5th Cir. 1996). "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." <u>Id</u>.

**B.   Securities Fraud**

This action was filed pursuant to §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(2), and 77o; §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.  It is subject to the pleading requirements prescribed by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, <u>et seq</u>.

1.   <u>Securities Act</u>

a.  Section 11 of the Securities Act creates liability for registration statements containing false material facts or omissions of material facts.  Section 11 states that "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person

acquiring such security . . . may, either at law or in equity, . . . sue (1) every person who signed the registration statement; [and] (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing . . ."  15 U.S.C. § 77k (West 2002).

b.  Section 12(a)(2) imposes similar liability on persons who make untrue statements of material facts or who omit material facts by means of a prospectus or oral communication.  It provides, in pertinent part, that any person who:

> offers or sells a security . . ., by the use of any means
> or instruments of transportation or communication in
> interstate commerce or of the mails, by means of a
> prospectus or oral communication, which includes an
> untrue statement of a material fact or omits to state a
> material fact necessary in order to make the statements,
> in the light of the circumstances under which they were
> made, not misleading (the purchaser not knowing of such
> untruth or omission), and who shall not sustain the
> burden of proof that he did not know, and in the exercise
> of reasonable care could not have known, of such untruth
> or omission, shall be liable . . . to the person
> purchasing such security from him . . . .

15 U.S.C. § 77l(2).

c.  Section 15 provides for the liability of "controlling persons" and states:

> Every person who, by or through stock ownership, agency,
> or otherwise, or who, pursuant to or in connection with
> an agreement or understanding with one or more other
> persons by or through stock ownership, agency, or
> otherwise, controls any person liable under sections 77k
> or 77l of this title, shall also be liable jointly and
> severally with and to the same extent as such controlled
> person to any person to whom such controlled person is
> liable, unless the controlling person had no knowledge of
> or reasonable ground to believe in the existence of the

facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

2.  Exchange Act

a.  Section 10(b) of the Exchange Act makes it unlawful for

any person

To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).   Rule 10b-5, in relevant part, makes it

unlawful for any person, directly or indirectly

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b) (1998).

b.  Section 20(a) of the Exchange Act, like section 15 of

the Securities Act, also defines controlling person liability.  It

provides, in pertinent part, that "[e]very person who, directly or

indirectly, controls any person liable under any provision of this

chapter . . . shall also be liable jointly and severally with and

to the same extent as such controlled person."  15 U.S.C. § 78t(a).

3.  Rule 9(b) and the Private Securities Litigation Reform Act

Because their claims sound in fraud, plaintiffs' complaint

must satisfy the strict pleading requirements for fraud set forth

in Fed. R. Civ. P. 9(b):

> In all averments of fraud or mistake, the circumstances
> constituting fraud or mistake shall be stated with
> particularity.   Malice, intent, knowledge, and other
> condition of mind of a person may be averred generally.

See Williams, 112 F.3d at 177; Tuchman v. DSC Communications Corp.,

14 F.3d 1061, 1067-68 (5th Cir. 1994); Shushany, 992 F.2d at 520-

21.

The Private Securities Litigation Reform Act of 1995 ("PSLRA")

reinforced the particularity requirement for allegations made on

information and belief:

> [T]he complaint shall specify each statement alleged to
> have been misleading, the reason or reasons why the
> statement is misleading, and, if an allegation regarding
> the statement or omission is made on information and
> belief, the complaint shall state with particularity all
> facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).   Particularity is required so that the

complaint provides defendants with fair notice of the plaintiffs'

claims, protects defendants from harm to their reputation and

goodwill, reduces the number of strike suits, and prevents

plaintiffs from filing baseless claims and then attempting to

discover unknown wrongs.   Tuchman, 14 F.3d at 1067.   Dismissals for

failure to plead fraud with particularity under either Rule 9(b) or

the PSLRA are treated as dismissals for failure to state a claim

under Fed. R. Civ. P. 12(b)(6).   Lovelace, 78 F.3d at 1017, citing

Shushany, 992 F.2d at 520.

## IV.   Defendants' Motions to Dismiss:
## Section 10(b) and Rule 10b-5

Defendants argue that plaintiffs' complaint should be

dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state

a claim and pursuant to Fed. R. Civ. P. 9(b) and the PSLRA for failure to plead fraud with particularity. Specifically, defendants argue that plaintiffs' claims under § 10b and Rule 10b-5 of the Exchange Act should be dismissed because plaintiffs have failed to allege material misrepresentations and/or omissions, failed to plead scienter or reliance, and failed to state their claims with factual particularity. Defendants also argue that this action should be dismissed because plaintiffs' claims relating to defendants' "forward-looking" statements are barred by the "safe harbor" provisions of the PSLRA and other applicable securities regulations.

## A.    Material Misrepresentations and Omissions

Defendants argue that this action should be dismissed for failure to state a claim because plaintiffs' lengthy complaint fails to allege any material misleading statements or omissions. Plaintiffs respond that they have sufficiently pleaded a cause of action under the federal securities laws and Rule 9(b) because their complaint identifies the allegedly fraudulent statements and omissions, specifies the source of the statements and when and where they were made, and explains why the statements were materially false or misleading. Plaintiffs also argue that they have sufficiently alleged scienter and reliance.

As explained above, plaintiffs' complaint specifically identifies sixteen different documents containing statements that

they allege on information and belief were false and/or misleading when made.  These statements fall into four general categories: (1) statements about Azurix's privatization and other business strategies; (2) statements about Azurix's acquisitions, including statements involving the Buenos Aires concession and associated due diligence conducted; (3) statements about Azurix's financial condition, including potential earnings; and (4) statements about Azurix's future business prospects.

To state a claim under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 the plaintiffs must show:  (1) a misstatement or an omission (2) of material fact (3) made in connection with the sale or purchase of a security (4) with the intent to defraud (scienter) (5) on which the plaintiffs relied and (6) which proximately caused [the plaintiffs'] injury.  <u>Williams v. WMX Technologies, Inc.</u>, 112 F.3d 175, 177 (5th Cir.), <u>cert. denied</u>, 118 S. Ct. 412 (1997).  <u>See also Tuchman</u>, 14 F.3d at 1067.  "Pleading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"  <u>Williams</u>, 112 F.3d at 177, <u>quoting</u> <u>Tuchman</u>, 14 F.3d at 1068.  <u>See also Melder v. Morris</u>, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994).  "[A]rticulating the elements of fraud with particularity [also] requires a plaintiff to . . . explain why the statements were fraudulent."  <u>Williams</u>, 112 F.3d at 177, <u>citing</u> <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993).

A misrepresentation is not actionable unless it is material. Tuchman, 14 F.3d at 1067.  To meet the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 108 S. Ct. 978, 983 (1988). "[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." Rubenstein v. Collins, 20 F.3d 160, 167-168 (5th Cir. 1994).  The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment."  Id. at 168, quoting Krim v. BancTexas Group Inc., 989 F.2d 1435, 1445 (5th Cir. 1993).  Inclusion of cautionary language, along with disclosure of any firm-specific adverse facts or assumptions, is relevant to the materiality inquiry, but is not per se dispositive of the inquiry. Rubenstein, 20 F.3d at 168.

Plaintiffs must also allege reliance on defendants' material misrepresentations or omissions.  In this case plaintiffs premise the reliance element of their fraud claims in part on the fraud-on-the-market doctrine (¶ 38).  This doctrine allows plaintiffs who may not have read the alleged misrepresentations to rely upon market conditions reflecting the fraud.  The doctrine presumes that

an established and efficient market assimilates all of the available information regarding a particular stock, sets the stock price accordingly, and that investors make their decisions in reliance on the integrity of an informed market.  Where material misrepresentations have been placed into the mix of information or where omissions render the market information misleading, the stock price is skewed and investors may be defrauded.  See Basic, 108 S. Ct. at 983; Abell v. Potomac Ins. Co., 858 F.2d 1104, 1120-21 (5th Cir. 1988) (plaintiffs can recover under the fraud-on-the-market theory "if [they can] prove that the defendant's non-disclosures materially affected the market price of the security"), vacated on other grounds sub nom. Fryar v. Abell, 109 S. Ct. 3236 (1989).

Plaintiffs are entitled to a rebuttable presumption of reliance based on the fraud-on-the-market theory if they can show that materially misleading statements were, in fact, disseminated into "an impersonal, well-developed market for securities." Basic, 108 S. Ct. at 991.  Defendants can rebut the presumption if they show that the market price was not affected by their misrepresentations or that the plaintiffs did not trade in reliance on the integrity of the market place.  Id. at 992; Nathenson v. Zonagen Inc., 267 F.3d 400, 414 (5th Cir. 2001) (fraud-on-the-market theory may not be the basis for recovery in respect to an alleged misrepresentation which does not affect the market price of the security in question).

1.  The Registration Statement and Prospectus

Defendants argue that plaintiffs have failed to plead that defendants made materially false or misleading statements in the June 9, 1999, registration statement or the June 11, 1999, prospectus.

Plaintiffs claim that defendants misrepresented the future success of Azurix's business plan in the prospectus by "touting [Azurix's] ability to take advantage of the growing trend of privatization and outsourcing of government-owned water and wastewater assets and services," and by "tout[ing] Azurix's ability to become a successful player in the global water and wastewater industry."[7]  Plaintiffs allege that these statements were misleading because prior to or at the time of the IPO, Azurix had already "recognized" that its privatization strategy was a failure.

As factual support for their allegations, plaintiffs allege that (1) a report compiled by Wasserstein Perella & Co.[8] ("Wasserstein Perella") in December of 2000 stated that "Azurix was at a disadvantage in bidding for large concessions because its cost of capital was significantly higher than competitors" and that the Buenos Aires concession had "faced numerous problems <u>since the</u>

---

[7]Lead Plaintiffs' Memorandum in Opposition to the Motions of the Azurix Defendants, Enron Corp. and Atlantic Water Trust to Dismiss the Complaint, Docket Entry No. 37, at p. 2.

[8]In connection with Enron's going-private transaction with Azurix in December of 2000, a special committee of Azurix retained Wasserstein Perella & Co. to examine the financial fairness of the transaction.

acquisition including incomplete customer accounts, difficulties in accounts receivable collection, water quality issues and disputes over tariffs" (¶ 133) (emphasis added); (2) "[f]ormer employees also confirmed defendants' actual knowledge of the false and misleading statements alleged herein when made" (¶ 133(b)); and (3) a "former Azurix employee" stated that during the period of June of 1999 through June of 2000, Azurix had certain employees assess the Buenos Aires concession before Azurix took over its operations, and during this review, the employees learned that the concession had been poorly operated and suffered serious problems with collections (¶ 77).

These allegations are not sufficient to state a claim for which relief may be granted. Even though Wasserstein Perella may have thought or may have been correct in December of 2000 that Azurix suffered business difficulties throughout its existence, plaintiffs have failed to allege facts demonstrating that defendants knew or reasonably should have known that these statements were false and/or misleading when made in June of 1999. See Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y.), aff'd, 956 F.2d 1161 (2d Cir. 1991). Plaintiffs also fail to explain who these "former employees" are who confirmed plaintiffs' allegations of fraud, what positions in the company these employees held, and which exact misrepresentations they were confirming.[9]

---

[9]Plaintiffs erroneously argue that their complaint identifies these former employees and the positions they held with Azurix.
(continued...)

Moreover, the court concludes that these statements are not actionable because they are merely statements of corporate optimism.  Such statements are not actionable because no reasonable investor would rely on obvious "puffery."  See Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir. 1993); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997).  Plaintiffs' conclusory allegations that defendants fraudulently "touted" their probabilities for success, simply because Azurix's business prospects ultimately declined, are not sufficient to state a claim for securities fraud.  See In re Donald J. Trump Casino Sec. Litig., 793 F. Supp. 543, 556-57 (D.N.J. 1992), aff'd, 7 F.3d 357 (3d Cir. 1993) (fraud by hindsight not actionable), cert. denied, 114 S. Ct. 1219 (1994); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.) (same), cert. denied, 498 U.S. 941 (1990).

Plaintiffs also complain that Azurix advertised its "experienced management and business development teams," "operating experience and technical expertise," and other areas of expertise.  The court concludes that these statements are not actionable because plaintiffs have not pleaded any facts indicating that the statements were untrue or that Azurix's management team actually lacked such expertise.  A company's expressions of confidence in

_____

[9](...continued)
See Lead Plaintiffs' Memorandum in Opposition to the Motions of the Azurix Defendants, Enron Corp. and Atlantic Water Trust to Dismiss the Complaint, Docket Entry No. 37, at p. 44.  The paragraph references to which plaintiffs cite (¶¶ 20-25) refer only to the individual defendants and their positions with the company.

its management or business are not actionable, especially where, as here, all historical information appears to be factually correct. Melder, 27 F.3d at 1100. Although Azurix ultimately performed poorly in its business enterprises, even well-managed enterprises can fail. The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud. See Shushany, 992 F.2d at 524-25.

Plaintiffs allege that Azurix identified "numerous large public privatization projects . . . that were targeted for those respective regions." Defendants argue that plaintiffs have failed to plead facts showing that any single privatization project identified in the prospectus was not, at the time, a viable potential acquisition that Azurix might have pursued. The court agrees and concludes that this statement is not actionable because plaintiffs have not shown that it was untrue or misleading when made. In fact, plaintiffs admit in their complaint that Azurix acquired the Buenos Aires concession and bid on large privatization projects elsewhere (¶¶ 48-50, 81(a)).

Plaintiffs also complain of alleged misrepresentations regarding capital improvements required for the Buenos Aires concession. Plaintiffs allege that defendants stated that financing "would" come from operating cash flows and long-term debt and equity at the concession level, as opposed to from short-term debt. The prospectus actually states, however, that Azurix "anticipated" that funding for capital improvements would come from these

sources, and "estimate[d]" and "anticipated" the amount of certain capital expenditures.[10]  Moreover, Azurix explained in the documents that its efforts to finance capital improvements through long-term debt and equity was contingent upon its ability to access capital markets.[11]  Azurix made no guarantees regarding the availability of future financing:  "There can be no assurance that we will be successful in securing any financing arrangements."[12]  Because plaintiffs have failed to plead facts showing that these statements were false or misleading when made, the court concludes that these statements are not actionable.

Plaintiffs also complain of defendants' statements in the prospectus regarding due diligence.  Plaintiffs allege that the prospectus, in stating that Azurix would evaluate potential projects to assess their value by conducting a due diligence review, misled the public into concluding that defendants had performed due diligence prior to bidding on these projects. Plaintiffs also allege that Azurix did not carefully and adequately perform due diligence prior to acquiring the Buenos Aires concession.  Plaintiffs allege that if defendants had conducted due diligence, they would have discovered, and therefore that they

---

[10]Azurix Common Stock Prospectus, Exhibit 4 attached to Appendix to Joint Motion of Azurix Defendants to Dismiss Complaint for Failure to State a Claim, Docket Entry No. 32 ("Appendix"), at p. 71.

[11]Id. at pp. 9-10.

[12]Id. at p. 32.

failed to disclose at the time of the IPO, that records and accounts for the Buenos Aires concession were incomplete, that certain assets had not yet been transferred, that there were difficulties in accounts receivable collection, or that water quality issues and disputes over tariffs existed.   Plaintiffs allege that defendants knew of these issues at the time of the IPO (and therefore must have concealed these facts) because (1) Azurix revealed on March 30, 2000, in its Form 10-K that it had not received complete billing and customer records when it took over the Buenos Aires concession and that not all of the assets had been transferred (¶ 71); and (2) on May 5, 2000, the Houston Business Journal reported that Azurix was in violation of Argentinean water quality standards, and that authorities in the city of Bahia Blanca had ordered Azurix to spend large amounts to fix the quality of the water (¶ 74).

Defendants argue that plaintiffs have not pleaded facts indicating that a known, existing problem was inadequately disclosed at the time the prospectus was filed.   For example, defendants argue that plaintiffs do not allege that defendants knew in June of 1999 that Buenos Aires billing records were or would be incomplete.   Defendants also argue that plaintiffs cannot rely on events arising after the IPO as a basis for alleging that defendants committed fraud and should have disclosed problematic events earlier.   Defendants argue that Azurix did not take actual possession of the Buenos Aires concession until July of 1999, after

the IPO had been completed, and thus did not know of these issues at the time of the IPO and the filing of the registration statement and prospectus.  Furthermore, water quality problems that arose in Bahia Blanca first surfaced in April of 2000, ten months after the IPO.  Plaintiffs do not explain how defendants could have known in June of 1999 that algae would infect the water at Bahia Blanca and greatly increase the subsequent water remediation costs to the company.

Moreover, Azurix disclosed in the prospectus that there was a risk that substantial problems might not be identified through due diligence:  "No assurance can be given that we will identify all risks related to a transaction."[13]  Azurix also disclosed that it might face difficulties collecting accounts in developing countries:

> There is a risk that we will operate in countries whose legal systems do not have established or well-enforced collection mechanisms for water supply and wastewater treatment services.  Also, customers in such countries may not be able or willing to pay for water services. This could have a material adverse effect on our financial condition and results of operations.[14]

Under these circumstances, a rational investor would not have relied on the due diligence statements contained in the prospectus and would not have assumed that there would be no difficulties whatsoever in Buenos Aires.  Accordingly, the court concludes that these statements are not actionable.

---

[13] Id. at p. 9.

[14] Id. at p. 12.

Azurix explained in its registration statement and prospectus that "[b]ecause we have a limited operating history, our future operating results are difficult to forecast and our future financial or operating results may be materially different from the results in this prospectus.  These differences could adversely affect the market price of our common stock."[15]  The company then disclosed the many risks associated with its business plan and the factors that might cause the company to perform poorly in the future.[16]  Because plaintiffs have failed to allege any facts showing that statements contained in the registration statement and prospectus were knowingly false or misleading when made, and because plaintiffs could not have relied on any of the statements in the prospectus, in light of Azurix's risk warnings and because the statements were merely expressions of corporate optimism, the court concludes that these claims are not actionable.  See Melder, 27 F.3d at 1101 n.8 ("These allegations boil down to plaintiffs' attempt to chastise as fraud business practices that, in hindsight, might have been more cautious.  Misjudgments are not, however, fraud.").

### 2.  Post-IPO Statements:  Safe Harbor Provisions

Defendants argue that many of plaintiffs' claims involving allegedly false or misleading post-IPO statements relate to

---

[15]Azurix Prospectus, Exhibit 4 attached to Appendix to Joint Motion of Azurix Defendants to Dismiss Complaint for Failure to State a Claim, Docket Entry No. 32, at p. 8.

[16]Id. at pp. 8-17.

"forward-looking statements" that are not actionable in this case. Plaintiffs respond that the statutory safe harbor provided for certain forward-looking statements does not apply to any of the statements pleaded in their complaint.

The PSLRA provides a statutory "safe harbor" for forward-looking statements.   15 U.S.C. §§ 77z-2(c) and 78u-5(c).   A "forward looking statement" is "[a] statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items."   SEC Rule 175, 17 C.F.R. § 230.175.   Under the safe harbor provisions a person is not liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."   15 U.S.C. §§ 77z-2(c)(1)(A)(i) and 78u-5(c)(1)(A)(i).   Alternatively, liability does not attach if the plaintiff fails to prove that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading."   15 U.S.C. §§ 77z-2(c)(1)(B)(i) and 78u-5(c)(1)(B)(i).

Defendants argue that every post-IPO document that contained a forward-looking statement identified these statements within each

document and contained the warnings required by the PSLRA.   The
court agrees.   For example, the August 5, 1999, press release
states:

> This press release includes forward-looking statements
> within the meaning of Section 27A of the Securities Act
> of 1933 and Section 21E of the Securities Exchange Act of
> 1934.  Although Azurix believes that its expectations are
> based on reasonable assumptions, it can give no assurance
> that these expectations will prove to be correct.
> Important factors that could cause actual results to
> differ materially from the expectations reflected in the
> forward-looking statements include, among other things:
> the ability to enter new water and wastewater markets in
> the United States and in other jurisdictions; . . . and
> other factors identified in Azurix's reports filed with
> the Securities and Exchange Commission.[17]

This and other similar statements in defendants' post-IPO documents
contained meaningful cautionary language explaining to investors
the risk factors that might cause actual business results to differ
from those anticipated by Azurix.[18]   Accordingly, these statements
do not constitute actionable fraud.   Moreover, even if these
statements were not shielded by the safe harbor provisions of the
PSLRA, the court concludes, as discussed below, that plaintiffs

---

[17]August 5, 1999, News Release, Exhibit 7 attached to Appendix,
at unnumbered p. 2.

[18]Cautionary language in relation to forward-looking statements
is also given in the following documents:  the August 16, 1999,
Form 10-Q, Exhibit 9 attached to Appendix, at p. 24; the
November 4, 1999, press release, Exhibit 17 attached to Appendix,
at unnumbered pp. 5-6; the November 15, 1999, Form 10-Q, Exhibit 18
attached to Appendix, at p. 26; the March 30, 2000, Form 10-K,
Exhibit 27 attached to Appendix, at pp. 32-38; the May 15, 2000,
Form 10-Q, Exhibit 31 attached to Appendix, at p. 13; the August 8,
2000, press release, Exhibit 32 attached to Appendix, at p. 1.

have failed to state actionable claims for any of the post-IPO statements listed in their complaint.

### 3.  Allegedly False or Misleading Post-IPO Statements

Plaintiffs allege that Azurix "reported to analysts at the time of the IPO that Azurix's earnings . . . would approximate $500 million for the year 2000 and $800 million for the year 2001" (¶ 79). Plaintiffs do not specify who made these reported earnings projections, however, or to whom; nor do plaintiffs identify the specific content of the statement or when it was made. The court concludes that this statement is not actionable because it fails to comply with the pleading requirements of particularity as promulgated under Rule 9(b) and the PSLRA. See Tuchman, 4 F.3d at 1067. Moreover, "projections of future performance not worded as guarantees are generally not actionable under federal securities laws." Krim, 989 F.2d at 1446.

The court also concludes that the three PaineWebber reports dated July 6, 1999, August 6, 1999, and October 15, 1999, do not contain any actionable misleading statements or omissions. The July 6 report rated Azurix a "buy," set a twelve-month target price of $32 per share, and stated that "[m]anagement has identified approximately $16 billion in potential privatization projects that are likely to come into fruition over the next 18 to 24 months" (¶ 78). The August 6 report reiterated PaineWebber's "buy" rating for Azurix, and also stated that Azurix's "acquisition strategy

remains robust," and that the Buenos Aires concession established the company as "a major participant in the Argentine water market." This report also opined that the concession "should begin contributing to operating results in the third quarter" (¶ 82). The October 15 report maintained PaineWebber's "buy rating" for Azurix, and stated that "[m]anagement has recently emphasized that the Company's pipeline of attractive privately and publicly announced transactions remains very full and that investors should anticipate several more announcements in the next few months" (¶ 87).

Plaintiffs have again failed to satisfy Rule 9(b) and the PSLRA by identifying who at Azurix made these statements to PaineWebber analysts. Moreover, a company and its officers cannot generally be held liable for statements reported by third parties such as stock analysts. See Raab, 4 F.3d at 288-89. Although plaintiffs argue that defendants communicated false statements directly to analysts to use them as conduits to the securities market,[19] plaintiffs have not pleaded supporting facts, such as what statements were communicated, who communicated them, or how defendants were able to control the content of the analysts' comments.

To hold corporate defendants liable for the statements of third parties, plaintiffs must allege facts suggesting that the

---

[19]See Lead Plaintiffs' Memorandum in Opposition to the Motions of the Azurix Defendants, Enron Corp. and Atlantic Water Trust to Dismiss the Complaint, Docket Entry No. 37, at pp. 32-34.

corporation "sufficiently entangled itself with the [third parties' statements] to render those productions attributable to it." Elkind v. Liggett & Meyers, Inc., 635 F.2d 156, 163 (2d Cir. 1980). A defendant may become sufficiently entangled by reviewing the third-parties' statements and making a representation that the information is true or in accordance with the company's views, or by exercising some measure of control over the content of the statements. Raab, 4 F.3d at 288. Here, plaintiffs have only pleaded that the reports published by PaineWebber were based on information provided by unspecified defendants. Because plaintiffs fail to allege that any of the defendants adopted these reports or exercised any control over their contents, the court concludes that defendants cannot be held liable for any false and/or misleading statements contained in them.

Plaintiffs allege that the statements made in the August 5, 1999, press release, and the August 16, 1999, Form 10-Q are materially false and/or misleading. These documents reported that the second quarter of 1999 had been "a period of significant accomplishment for Azurix," that the Buenos Aires acquisition "establish[ed] the company as a major participant in the Argentine water market," that the IPO was "very successful," and that the IPO "provide[d] Azurix with access to additional financial resources to fund the many growth opportunities that will distinguish the company as a leading player in the global water industry." These

allegations do not support a claim for securities fraud.   <u>See</u>, <u>e.g.</u>, <u>Lain v. Evans</u>, 123 F.Supp.2d 344 (N.D. Tex. 2000) (statements about "aggressive growth plans . . . to become a major player" in the industry not actionable).   Plaintiffs have not shown that these statements were untrue when made; indeed, the IPO did provide Azurix with $300 million in "additional financial resources."   The court concludes that these statements are not actionable because they are either true or are only general "puffing."   Plaintiffs cannot convert general, optimistic statements into actionable misrepresentations.   <u>See</u> <u>Zonagen</u>, 267   F.3d at 419 (optimistic generalizations are inactionable "puffing" and cannot support plaintiff's claims).

The court also concludes that the statement in the October 20, 1999, <u>Dow Jones</u> news story is not actionable.   On this day the <u>Dow Jones</u> reported that following a 7.7% dip in the price of Azurix stock, an Azurix spokesperson commented that Azurix's "fundamentals are strong" (¶ 88).   This statement is not actionable because it was too vague to have been relied upon by reasonable investors. <u>See</u> <u>Raab</u>, 4 F.3d at 289-90.   Moreover, instead of artificially inflating Azurix's stock price, after the statement the price of Azurix shares continued to decline.   On October 20, 1999, the day of the announcement, Azurix's stock price fell to $12.00 per share from the previous day's closing at $13.75 per share; and on the following day, the stock fell further to $11.375.   Because

plaintiffs fail to allege that defendants' favorable and allegedly false and/or misleading statements had a correspondingly favorable impact on Azurix's share price, and because plaintiffs' complaint demonstrates that these statements did not have a favorable effect on Azurix's share prices, the court concludes that these statements, even if misleading, were not material and that plaintiffs did not rely on them. See Basic, 108 S. Ct. at 992.

Plaintiffs also allege that statements contained in the November 4, 1999, press release, and the November 15, 1999, Form 10-Q were materially false and/or misleading. These documents stated that Azurix's "pipeline of private transactions and announced public tenders remains very strong," that "the timing of certain transactions is unpredictable," and that the company intended to "focus more on privately negotiated opportunities and less on the large public privatizations."

The court concludes that the statement involving the "pipeline of private transactions" is inactionable because it is merely an expression of corporate optimism, or "puffery." See Raab v. General Physics Corp., 4 F.3d 286, 289-90 (4th Cir. 1993) (statements that "business couldn't be better" and "we already have a sizeable lead over our competition" not actionable); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) (prediction of "significant growth" not actionable).

Plaintiffs allege that the remainder of the statements were false and/or misleading because the company failed to disclose that

several major privatization projects had already been canceled or postponed. The court concludes, however, that these statements are not actionable because plaintiffs have failed to allege a correspondingly favorable impact on Azurix's share price. Azurix's stock price tumbled nearly 40% following the November 4, 1999, press release declining from $12.8125 per share to $7.775 per share. Because plaintiffs' complaint demonstrates that these statements did not have a favorable effect on Azurix's share price, the court concludes that these statements, even if misleading, were not material and that plaintiffs did not rely on them. See Basic, 108 S. Ct. at 992.

The plaintiffs allege that the February 7, 2000, press release and the March 30, 2000, Form 10-K contained false and/or misleading statements. These documents reported that Azurix had "assembled the core assets and capabilities for strong growth in our key markets" and had "successfully expanded our operations through ownership of assets and through the services we offer" (¶¶ 101, 106). The documents also identified its Madera project as possessing "considerable potential both for the community and for the company." The court concludes that these statements are not actionable because they are merely generalized positive "puffing" statements. Furthermore, the company's comments regarding Azurix's expansion of its business to include "municipal and industrial customers" (¶ 104) was true (¶¶ 84-86).

Plaintiffs also allege that the March 30, 2000, Form 10-K failed to disclose problems with the Buenos Aires concession involving poor water quality and water disputes. Plaintiffs claim in their complaint, however, that water problems began in Argentina in April of 2000. Plaintiffs also fail to allege sufficient facts indicating that defendants knew of these problems when the Form 10-K was filed. In addition, Azurix's stock price continued to decline after these statements were made. Because plaintiffs' complaint demonstrates that these statements did not have a favorable effect on Azurix's share prices the court concludes that these statements, even if misleading, were not material and that plaintiffs did not rely on them. See Basic, 108 S. Ct. at 992.

Plaintiffs also complain of the May 8, 2000, press release, and the May 15, 2000, Form 10-Q, which stated that Azurix was "making steady progress toward the Company's objectives to maximize the returns on our existing businesses" (¶¶ 116, 118). The court concludes that this statement is not actionable because it was too vague to have been relied upon by reasonable investors. See Raab, 4 F.3d at 289-90. Indeed, "'[s]oft,' 'puffing' statements such as these generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." Raab, 4 F.3d at 289.[20]

---

[20]Plaintiffs argue that this court should not follow the holding in Raab. Defendants point out, and the court agrees, that
(continued...)

Finally, plaintiffs allege that on the last day of the Class Period, August 8, 2000, defendants made material false and/or misleading statements in a press release that stated that Azurix's "management team is working hard on the challenges that we face in Argentina and to maximize the returns on our existing businesses." The court concludes that these statements are not actionable because they are general "puffing" expressions of corporate optimism. Raab; Parnes, 122 F.3d at 547. Moreover, Azurix's stock price continued to decline following this announcement; the share price fell $1-5/64 to $7-1/4 on heavy trading (¶ 10). Because plaintiffs' complaint demonstrates that these statements did not have a favorable effect on Azurix's share prices, the court concludes that these statements, even if misleading, were not material and that plaintiffs did not rely on them. See Basic, 108 S. Ct. at 992. For the foregoing reasons, the court concludes that plaintiffs have failed to plead facts showing that defendants made any material misleading statements or omissions.

**B.    Scienter**

Defendants argue that plaintiffs have also adequately pleaded scienter under the Exchange Act or Rule 10b-5. Plaintiffs allege that defendants possessed the required scienter because they knew

---

[20](...continued)
the Fifth Circuit has adopted the Raab holdings in its own opinions. See, e.g., In re Westcap Enterprises, 230 F.3d 717, 728 (5th Cir. 2000).

or recklessly disregarded that the public documents and statements issued in Azurix's name were materially false and misleading; they knew or recklessly disregarded that such statements or documents would be disseminated to the investing public; and they knowingly participated in the issuance or dissemination of such statements or documents as primary violators of federal securities laws (¶ 132).

"Scienter," as applied to conduct giving rise to an action for civil damages under the Securities Exchange Act and Rule 10b-5, is defined as "a mental state embracing intent to deceive, manipulate or defraud." Lovelace, 78 F.3d at 1018, quoting Ernst & Ernst v. Hochfelder, 96 S. Ct. 1375, 1381 n.12 (1976). Plaintiffs cannot survive defendants' motion to dismiss by simply alleging that defendants had fraudulent intent. The PSLRA requires plaintiffs to set forth specific facts to support a "strong inference" of fraudulent intent.

### (2)   Required state of mind

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (emphasis added). See also Lovelace, 78 F.3d at 1018, citing Tuchman, 14 F.3d at 1068. The PSLRA provides that if a plaintiff does not meet this requirement, the district court shall, on defendant's motion, dismiss the complaint. Id.

§ 78u-4(b)(3).   Severe recklessness, which "properly defined and adequately distinguished from mere negligence," resembles a slightly lesser species of intentional misconduct, can form a basis for scienter for § 10(b) and Rule 10b-5 liability.   See Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir. 2001), citing Broad v. Rockwell, 642 F.2d 929, 961 (5th Cir. 1981).

Before enactment of the PSLRA the Fifth Circuit followed the Second Circuit's approach that a plaintiff could raise an inference of scienter either by pleading facts that identify circumstances indicating defendants' conscious or severely reckless behavior, or by pleading facts that allege defendants' motive and opportunity to commit securities fraud.   Lovelace, 78 F.3d at 1018-1019.   See also Melder, 27 F.3d at 1102; Tuchman, 14 F.3d at 1068; In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 269 (2d Cir. 1993), cert. denied, 114 S. Ct. 1397 (1994).   Allegations of motive and opportunity are no longer sufficient, however, to plead a strong inference of scienter under the Exchange Act and Rule 10b-5.   See Zonagen, 267 F.3d at 411-12.   "What must be alleged is not motive and opportunity as such but particularized facts giving rise to a strong inference of scienter."   Id. at 412.

### 1.  Motive and Opportunity

Plaintiffs allege that defendants had three motives for concealing material, negative information about Azurix:   (1) to gain access to capital, specifically to inflate the price of Azurix

stock so that the company could use its stock as currency for acquisitions; (2) to ensure the success of a later Azurix debt offering, and (3) to increase the individual defendants' executive compensation.

Plaintiffs allege that the defendants engaged in their false scheme in order to inflate the price of Azurix's common stock so that the company could, inter alia, use its stock as currency for numerous acquisitions (¶¶ 84-86, 135). As factual support for this allegation, plaintiffs refer to an August 25, 2000, Bloomberg article reporting that "November 4, 1999 was 'the beginning of the end' of Azurix's business strategy because the precipitous drop that day crimped the Company's ability to make acquisitions using Azurix stock" (¶ 136).

Plaintiffs also allege that defendants were motivated to commit securities fraud in order to ensure the success of Azurix's $600 million debt offering, announced on January 26, 2000 (¶ 137).[21] At the time of this announcement Azurix stock had already fallen in price from $19 per share to $10.375 per share. Plaintiffs allege that Azurix required successful long-term financing either in the form of equity or long-term debt in order to stave off insolvency.

---

[21]The stated use of this debt offering was to pay down Azurix's revolving credit facilities, amounts outstanding under a credit agreement with Enron, and interest. Plaintiffs allege that with Azurix's "highly leveraged balance sheet" and "a declining stock price," "the success of the debt offering was critical for Azurix's survival" (¶ 100).

Plaintiffs claim that defendants were motivated to misrepresent the status and success of Azurix's privatization strategies and the Buenos Aires concession in order to gain access to badly needed capital at favorable interest rates (¶ 140).

The court is not persuaded by these arguments.  Allegations that defendants attempted to inflate a company's stock price to facilitate the raising of capital do not establish scienter.  See Melder, 27 F.3d at 1102 (alleged inflation of stock price to "successfully bring to fruition the [public] offerings" and to "enhance the value" of officer holdings and options insufficient to support strong inference of scienter); Tuchman, 14 F.3d at 1068-69; Zonagen, 267 F.3d at 420.  See also Acito v. IMCERA Group Inc., 47 F.3d 47, 54 (5th Cir. 1995).

Plaintiffs allege that defendants were also motivated to commit securities fraud by artificially inflating the price of Azurix stock because Azurix's executive compensation program was designed to reward performance that directly correlated with Azurix's success (¶ 145).  According to a Schedule 14A Information Statement filed with the SEC on May 1, 2000, "The Committee granted stock options for two million shares to Ms. Mark in February 1999 as an incentive to increase shareholder value.  These awards are tied to performance in that the executive only realizes income from stock options if the stock price rises."  Plaintiffs claim that Mark, Lay, Skilling, and Sutton owned shares of Azurix common stock

and were subject to these compensation provisions. The alleged desire to increase compensation does not support a strong inference of scienter. See Tuchman, 14 F.3d at 1068-69 (incentive compensation can hardly be the basis on which allegations of fraud are predicated); Melder, 27 F.3d at 1102. These allegations are not sufficient to raise an inference of scienter because, if accepted, such allegations would essentially eliminate the state of mind requirement as to all corporate officers and directors. See id.

Plaintiffs allege that the individual defendants had the opportunity to commit and participate in wrongful conduct because each was a senior executive officer, director, or controlling shareholder of Azurix and thus controlled the information disseminated to the investing public in press releases, SEC filings, and communications with analysts. Plaintiffs conclude, without any factual basis for these claims, that each defendant therefore must have falsified the information that reached the public concerning Azurix's business and financial condition (¶ 135). Merely alleging that the defendants knew or had access to information by virtue of their board or managerial positions is not sufficient to plead scienter. See Melder, 27 F.3d at 1103. Because plaintiffs have put forth only conclusory allegations in support of their claims, their claims fail. See Jefferson, 106 F.3d at 1250 (conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss).

2.  Other "Particularized" Facts

Plaintiffs also allege that defendants possessed the requisite scienter with regard to the alleged misrepresentations because (1) The Wasserstein Perella report stated that "[t]he Buenos Aires concession, the company's second largest asset, has faced numerous problems <u>since the acquisition</u> including incomplete customer accounts, difficulties in accounts receivable collection, water quality issues and disputes over tariffs" (¶ 133) (emphasis added); and (2) "[f]ormer employees also confirmed defendants' actual knowledge of the false and misleading statements alleged herein when made" (¶ 133(b)).

Plaintiffs allege that the phrase "since the acquisition" in the Wasserstein Perella report indicates that defendants knew of the problems surrounding the Buenos Aires concession from the inception of the project.  Plaintiffs offer no facts tending to support this allegation, however.  The court concludes that this allegation does not establish any inference of scienter.  Moreover, subsequent disclosures of negative information do not give rise to a strong inference that defendants knew the statements were materially false or misleading <u>when made</u>.  The Wasserstein Perella report does not establish that defendants knew at the time previous statements were made that information may have been misrepresented or omitted.  The allegation that "statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  <u>DiLeo</u>, 901 F.2d at 627.

Plaintiffs claim that "[f]ormer employees also confirmed defendants' actual knowledge of the false and misleading statements alleged herein when made" (¶ 133(b)); however, plaintiffs again fail to support this statement by identifying who made such confirmations, what positions in the company they held, which exact statements these employees confirmed, and when.  This allegation also does not establish a strong inference of scienter.

Plaintiffs argue that the timing of some of the individual defendants' resignations establishes scienter.  The court disagrees.  Gray's resignation, which occurred 13 days after the announcement of 1999 third-quarter results, Faldyn's resignation, which occurred the day after Azurix disclosed contract cancellations and postponements in the second half of 1999, and Mark's resignations, which occurred a few weeks after Azurix's operating results were disclosed on August 8, 2000, do not support a "strong inference" that these defendants knew of or recklessly disregarded the misstatements disseminated by Azurix during the Class Period.  If anything, the defendants' resignations indicate that the struggling company no longer had faith in its executives. This does not raise a strong inference of scienter.  Indeed, conclusory allegations that defendants "knowingly did this or recklessly did that" are insufficient to plead scienter.  See Zonagen, 267 F.3d at 419-20; Lovelace, 78 F.3d at 1019; Melder, 27 F.3d at 1102-03.

## C.   Factual Particularity as to Each Defendant

Plaintiffs allege throughout their complaint that Azurix and/or the individual defendants as a group violated the securities law by failing to disclose material information.  Defendants argue that plaintiffs' complaint must be dismissed because plaintiffs fail to plead with factual particularity the misrepresentations and scienter of each individual defendant.

Before the enactment of the PSLRA the Fifth Circuit held that general allegations did not meet the particularity requirement of Rule 9(b) if they did not state with particularity each defendant's representations.   See Tuchman v. DSC Communications Corp., 818 F. Supp. 971, 977 (N.D. Tex. 1993), aff'd, 14 F.3d 1061 (5th Cir. 1994).   See also Unimobil 84, Inc. v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986).  Under the PSLRA, however, plaintiffs may assert on information and belief that a statement or omission is misleading if the complaint states with particularity facts on which plaintiffs' belief is formed.  15 U.S.C. § 78u-4(b)(1).

While the PSLRA requires plaintiffs to state with particularity the facts that give rise to a strong inference of scienter, it does not state whether that inference needs to be established with specificity as to each individual defendant.  15 U.S.C. § 78u-4(b)(2).  District courts in this state appear to be split on the question of whether the PSLRA precludes plaintiffs from relying merely on the positions of individuals within an

organization to support allegations that they acted wrongly and/or with scienter.  Because of this court's conclusion that the plaintiffs have failed to plead facts establishing that defendants acted with scienter, either collectively or individually, the court need not decide whether the group pleading doctrine survives the PSLRA.  See Zuckerman v. Foxmeyer Health Corp., 4 F.Supp.2d 618, 622 (N.D. Tex. 1998) (group pleading doctrine survives enactment of PSLRA); and Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d 910, 916 (N.D. Tex. 1998) (group pleading doctrine does not survive the PSLRA).

For the foregoing reasons, the court concludes that plaintiffs have failed to state claims against Azurix and the individual defendants under § 10(b) of the Exchange Act and Rule 10b-5.

## V.  Sections 11 and 12(a)(2)

Defendants argue that plaintiffs have failed to state claims against Azurix and the individual defendants under § 11 and against all defendants under § 12(a)(2) of the Securities Act, because plaintiffs have not alleged that (1) defendants were statutory sellers under the Act, or that (2) plaintiffs purchased their shares in the IPO.  The court agrees.

For potential § 12(a)(2) liability to exist, defendants must have passed title to the plaintiffs as a "direct seller" (such as an underwriter), or solicited the transaction in which title passed to them.  Abell, 858 F.2d at 1114, citing Pinter v. Dahl, 108

S. Ct. 2063, 2076-79 (1988); <u>B.J. Crawford Interests v. Ghenns,</u> <u>Inc.</u>, 876 F.2d 507, 510 (5th Cir. 1989).  Where there is a firm commitment underwriting, such as that in the IPO in this case, the issuer sells the stock to be offered to the group of underwriters for the offering.  The underwriters then resell the stock to broker-dealers or investors.  <u>See</u> <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1215 (1st Cir. 1996).

Neither an issuer that sells its securities to an underwriter for resale to investors nor its officers or directors can be held liable as statutory sellers unless they actively solicited the plaintiffs' purchase of securities to further their own financial motives in the manner of a broker or vendor's agent.  <u>Shaw</u>, 82 F.3d at 1215.  This requirement is not satisfied by allegations that defendants were involved in preparing the registration statement or prospectus or any other activities necessary to effect the sale of the securities to the public.  <u>Id.</u> at 1216.

Seller status cannot be established by "substantial participation in the sales transaction, or proximate causation of the plaintiff's purchase."  <u>Pinter</u>, 108 S. Ct. at 2082.  Absent any allegation of direct contact of any kind between defendants and plaintiff-purchasers, as a matter of law the defendants are not statutory sellers.  <u>See</u> <u>In re Newbridge Networks Sec. Litig.</u>, 767 F. Supp. 275, 281 (D.D.C. 1991); <u>Cyrak v. Lemon</u>, 919 F.2d 320, 324 (5th Cir. 1990) (it was error to charge defendant as a seller if he

was merely "a motivating force behind the sale"). Thus, defendants cannot be held liable under § 12(a)(2) on the theory that it sold shares directly to plaintiffs. See Lone Star Ladies Inv. Club v. Schlotsky's Inc., 238 F.3d 363, 370 (5th Cir. 2001). The court concludes that plaintiffs have not pleaded any facts to support the allegation that defendants were statutory sellers under § 12.

Defendants also argue that plaintiffs have no standing to sue under § 11 or 12 of the Securities Act because plaintiffs did not purchase their shares of Azurix stock in the company's initial public offering. The liability provision at issue permits "any person acquiring" a security issued pursuant to a defective registration statement to sue in law or in equity a variety of defendants. 15 U.S.C. § 77k(a). Case law has limited the term "any person acquiring such security" to purchasers of shares issued and sold pursuant to the challenged registration statement, however. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 95 S. Ct. 1917, 1925 (1975); 7547 Corp. v. Parker & Parsley Development Partners, L.P., 38 F.3d 211, 222 (5th Cir. 1994); Klein v. Computer Devices, Inc., 591 F. Supp. 270, 273 (S.D.N.Y. 1984), clarified on reh'g, 602 F. Supp. 837 (S.D.N.Y. 1985). See also H.R. Rep. No. 85, 73rd Congress, 1st Sess., 5 (1933); Blue Chip Stamps, 95 S. Ct. at 1933 (1933 Act chiefly concerned with disclosure and fraud in connection with offerings of securities, primarily initial distributions of newly issued stock from

corporate issuers).  In <u>Gustafson v. Alloyd Co.</u>, 115 S. Ct. 1061,
1071 (1995), the Supreme Court analyzed the legislative history of
the 1933 Act and determined that Congress meant for § 12 claims to
apply only to public offerings.  <u>Accord</u>, <u>Lewis v. Fresne</u>, 252 F.3d
352, 357 (5th Cir. 2001) ("The House Report thus states with
clarity and specific reference to § 12 that § 12 liability is
imposed only as to a document soliciting the public.").

Because plaintiffs have failed to plead sufficient facts
indicating that defendants were "sellers" under the Securities Act,
and because it is undisputed that plaintiffs did not purchase their
shares of Azurix stock pursuant to the company's initial public
offering, the court concludes that plaintiffs have failed to state
any actionable claim under § 11 or 12(a)(2) of the Securities Act.

## VI.   <u>Sections 15 and 20(a)</u>

Defendants argue that plaintiffs have failed to plead
"controlling person" liability under § 15 of the Securities Act or
§ 20(a) of the Exchange Act.  Counts III and V of plaintiffs'
complaint seek to impose secondary liability upon Enron and the
individual defendants as "controlling persons" of Azurix.  Section
15 of the Securities Act provides that any person who "controls any
person liable under sections 77k or 77l of this title, shall also
be liable jointly and severally with and to the same extent as such
controlled person to any person to whom such controlled person is
liable."  15 U.S.C. § 77o.  Section 20(a) of the Exchange Act

provides that persons who, directly or indirectly, control any person liable under any provision of the Exchange Act, "shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Because plaintiffs have failed to adequately plead the violations alleged under the Securities Act and the Exchange Act, the court will also dismiss the § 15 and the § 20(a) claims for failure to adequately allege a primary violation by Azurix, the "controlled person." See Shields v. Cityhurst Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994).

## VII.  Conclusions

Because plaintiffs have failed to allege material misrepresentations and/or omissions, failed adequately to plead scienter or reliance, and failed to state their claims with factual particularity, the court concludes that plaintiffs have failed to state any actionable claim for securities fraud under § 10(b) of the Exchange Act or Rule 10b-5.

Because plaintiffs have failed to allege that defendants were statutory sellers under the Securities Act, and because plaintiffs did not purchase their shares of Azurix stock in the company's initial public offering, the court concludes that plaintiffs have failed to plead any actionable claim under §§ 11 and 12(a)(2) of the Securities Act.

Because plaintiffs have failed to state actionable claims for securities fraud under § 10(b) or Rule 10b-5 of the Exchange Act,

and because plaintiffs have failed to state actionable claims under §§ 11 and 12 of the Securities Act, plaintiffs have also failed to state actionable claims for secondary "controlling person" liability under § 20(a) of the Exchange Act or § 15 of the Securities Act.

Because Enron can only act through its officers and directors, and because the court found that none of Enron's officers or directors named as a defendant in this action are liable under any of plaintiffs' alleged statutory claims, the court would normally grant Enron's motion to dismiss.   However, because of Enron's pending bankruptcy proceeding,[22] the court **STAYS** this action as to Enron.   A petition filed under the Bankruptcy Code operates as a stay of the continuation of a judicial proceeding against the debtor to recover a claim against the debtor that arose before commencement of the bankruptcy proceedings.   11 U.S.C. § 362(a)(1). This action will be dismissed without prejudice with respect to Enron.   Plaintiffs may reinstate this action against Enron upon notice to this court of the discontinuance of the bankruptcy stay pursuant to 11 U.S.C. § 362(c)(2), provided such notice is filed within 30 days after the bankruptcy stay is discontinued.

---

[22]Enron filed for relief under Chapter 11 of the Bankruptcy Code on December 2, 2001.   The case is pending in the United States Bankruptcy Court for the Southern District of New York as Case No. 01-16034 (AJG).   See Suggestion of Bankruptcy, Docket Entry No. 45.

Enron Corp. and Atlantic Water Trust's Motion to Dismiss (Docket Entry No. 29) is **MOOT**.   The Joint Motion of Azurix Defendants to Dismiss Complaint for Failure to State a Claim (Docket Entry No. 30) is **GRANTED.**

**SIGNED** at Houston, Texas, on this the 20th day of March, 2002.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE